B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Barry + Diane Reynolds | DEFENDANTS Chap. 7 Trustee David Madoff<br>Riemer & Braunstein, Alan Braunstein, Mark Corner<br>James Gross - Madoff & Khoury<br>BOC - J Wesley Rawding |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Propria Persona | ATTORNEYS (If Known) |
|---|---|

| PARTY (Check One Box Only)<br>☑ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor    ☑ Other<br>☑ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Verified Criminal Complaint

18 USC 155, 241, 242, 1341, 1346, 876, 880, 645, 654, 1951, 1952

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

| FRBP 7001(1) – Recovery of Money/Property | FRBP 7001(6) – Dischargeability (continued) |
|---|---|
| ☐ 11-Recovery of money/property - §542 turnover of property | ☐ 61-Dischargeability - §523(a)(5), domestic support |
| ☐ 12-Recovery of money/property - §547 preference | ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury |
| ☐ 13-Recovery of money/property - §548 fraudulent transfer | ☐ 63-Dischargeability - §523(a)(8), student loan |
| ☐ 14-Recovery of money/property - other | ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation |
| | (other than domestic support) |
| **FRBP 7001(2) – Validity, Priority or Extent of Lien** | ☐ 65-Dischargeability - other |
| ☐ 21-Validity, priority or extent of lien or other interest in property | |
| | **FRBP 7001(7) – Injunctive Relief** |
| **FRBP 7001(3) – Approval of Sale of Property** | ☐ 71-Injunctive relief - imposition of stay |
| ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h) | ☑ 72-Injunctive relief – other |
| **FRBP 7001(4) – Objection/Revocation of Discharge** | **FRBP 7001(8) Subordination of Claim or Interest** |
| ☐ 41-Objection / revocation of discharge - §727(c),(d),(e) | ☐ 81-Subordination of claim or interest |
| **FRBP 7001(5) – Revocation of Confirmation** | **FRBP 7001(9) Declaratory Judgment** |
| ☐ 51-Revocation of confirmation | ☐ 91-Declaratory judgment |
| **FRBP 7001(6) – Dischargeability** | **FRBP 7001(10) Determination of Removed Action** |
| ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims | ☐ 01-Determination of removed claim or cause |
| ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, | |
| actual fraud | **Other** |
| ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny | ☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq. |
| (continued next column) | ☐ 02-Other (e.g. other actions that would have been brought in state court |
| | if unrelated to bankruptcy case) |

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☑ Check if a jury trial is demanded in complaint | Demand $ TO BE DETERMINED |
| Other Relief Sought<br>EMERGENCY RESTRAINING ORDER (ATTACHED) | |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | Chapter 7 |
| | ) | Case No.: 08-10775-FJB |
| BARRY REYNOLDS and | ) | |
| DIANE REYNOLDS, | ) | |
| | ) | Verified Criminal Complaint |
| BARRY REYNOLDS and | ) | Case No.: _____ |
| DIANE REYNOLDS | ) | |
| | ) | |
| Plaintiffs | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | |
| | ) | |
| THE BANK OF CANTON | ) | |
| J WESLEY RAWDING | ) | |
| DAVID MADOFF, CHAPTER 7 TRUSTEE | ) | |
| ATTORNEY JAMES GROSS | ) | |
| ATTORNEY MARK CORNER | ) | |
| ATTORNEY ALAN BRAUNSTEIN | ) | |
| | ) | |
| Defendant | ) | |

VERIFIED CRIMINAL COMPLAINT

Comes now Plaintiffs and file their Verified Criminal Complaint against the Bank of
Canton (the "BOC"), the BOC's attorneys, Alan Braunstein and Mark Corner, the Chapter 7
Trustee, David Madoff and his attorney James Gross for alleged violations under Title 18 of
the United States Code.

JURISDICTION

1.  This court has jurisdiction pursuant to 28 U.S.C. § 1334 wherein this is a core proceeding
arising in a case under title 11.

PARTIES

2.  Plaintiffs have made their home at 4 Alberta Lane, Lakeville, Massachusetts since 1997.

Verified Criminal Complaint
Page 1 of 16

3. The Bank of Canton is a duly formed corporation in the State of Massachusetts doing business at 557 Washington Street, Canton, Massachusetts 02021.

4. Attorney Alan Braunstein is legal council for the BOC, with the law firm Riemer & Braunstein, LLP, Three Center Plaza, Boston, MA 02108, which is a duly registered corporation in the State of Massachusetts.

5. Attorney Mark Corner is legal council for the BOC, with the law firm Riemer & Braunstein, LLP, Three Center Plaza, Boston, MA 02108, which is a duly registered corporation in the State of Massachusetts

6. Attorney David Madoff, Chapter 7 Trustee, Madoff & Khoury, LLP, 124 Washington Street, Suite 202, Foxborough, Massachusetts 02035, which is a duly formed corporation in the State of Massachusetts.

7. James Gross, Attorney for David Madoff, Chapter 7 Trustee, Madoff & Khoury, LLP, 124 Washington Street, Suite 202, Foxborough, Massachusetts 02035, which is a duly formed corporation in the State of Massachusetts.

Statement of Facts:

8. On February 4, 2008 Plaintiffs' filed a Bankruptcy Petition under Chapter 13 of the United States Bankruptcy Code.

9. On February 22, 2008, the BOC filed a Proof of Claim, claiming it held a note/mortgage on Plaintiffs' real property.

10. On May 19, 2008, Plaintiffs filed a motion pursuant to the Federal Bankruptcy Rules, Rule 3001(d) to have all secured creditors provide proof of their "perfected" secured interest in Plaintiffs property.

11. In response the BOC produced photocopies of Plaintiffs alleged note and mortgage as proof of the BOC's claim.

12. The documents submitted by the BOC conflicted with the claims made in the BOC's Proof of Claim, wherein the mortgage was recorded in the name of Mortgage Electronic Registration Systems, Inc. (hereinafter "MERS").

13. On October 27, 2008, Plaintiffs filed their first motion challenging the standing of the BOC, wherein the documentation submitted by the BOC conflicted with the BOC's Proof of Claim showing that the mortgage was recorded in the name of Mortgage Electronic Registration Systems, Inc.

14. Plaintiffs again challenged the BOC's standing and the court's jurisdiction on April 15, 2009.  To the best of Plaintiffs knowledge and belief, the BOC never established standing, nor did the court affirm Article III jurisdiction prior to proceeding to hear the BOC's motion to convert which was still pending before the court.

15. After Plaintiffs case was converted to one under Chapter 7, the BOC filed a second Proof of Claim, to which a photocopy of Plaintiffs' alleged note and mortgage were attached.

16. The documents submitted by the BOC conflicted with the claims made in the BOC's Proof of Claim, wherein the mortgage was recorded in the name of Mortgage Electronic Registration Systems, Inc. (hereinafter "MERS").

17. On July 2, 2009, Plaintiff attended a 341 creditors meeting with Chapter 7 Trustee, David Madoff.

18. At the July 2, 2009, 341 creditors meeting, Plaintiffs provided Attorney Madoff with the current appraisal of their real property located at 4 Alberta Lane, Lakeville, Massachusetts, attached as Exhibit A.

19. The appraisal dated May 13, 2009 revealed the property to be nearly $90,000 underwater from the alleged amount claimed to be owing on the alleged BOC loan.

20. On July 16, 2009, the Chapter 7 Trustee filed a "Verified" complaint against Plaintiff Diane Reynolds' Trust and her trustee Mr. Leo DuBois, alleging criminal wrongdoing.

21. On August 6, 2009, the Chapter 7 Trustee filed a "Verified" complaint against Plaintiffs alleging Plaintiffs engaged in criminal wrongdoing.

22. On January 26, 2010 a settlement and stipulation agreement was submitted to the bankruptcy court. The settlement and stipulation agreement involved all Defendants list above.

23. The court approved the settlement and stipulation agreement on March 26, 2010 without hearing. On February 18, 2010, Plaintiffs filed a formal judicial misconduct complaint. As part of that complaint, Petitioners outlined possible criminal misconduct on behalf of the Chapter 7 trustee and the Bank of Canton and its attorneys, see attached Exhibit B.

24. Plaintiffs have questioned the court at various hearings if the special "carve out", that is contained in the stipulation agreement, represented a conflict of interest regarding the Chapter 7 trustee's fiduciary duty. The stipulation agreement, attached as Exhibit C, on page 5, section 5(b) specifically calls for a special $35,000 carve out for Attorney Madoff:

> "Second, to the Trustee in an amount of up to $35,000 (the "Trustee Payment") as reimbursement for the allowed fees and expenses…"

Page 5, section 6:

"Other than the Trustee Payment…"

25. During a hearing conducted on July 20, 2009, Attorney Madoff stated that:

"but according to __both__ the bank and the __debtors,__ there is __equity__ in the property of the estate." [emphasis added]  As stated in items 18 and 19 above, Plaintiffs provided Attorney Madoff with a current appraisal of their property.

26. Stated in the Stipulation agreement between Attorney Madoff and the Bank of Canton, on page 2, item 5, Attorney Madoff ADMITS that Petitioners informed him there was no equity:

> "**The Debtors have asserted** that the amount secured by the mortgage exceeds the value of the Property and that, therefore, there is no equity in the Property."

27. Again in the Stipulation between Attorney Madoff and the Bank, that was executed on **February 10, 2010** page 3, item 10, Attorney Madoff and the bank indicate that there may be insufficient equity to pay the unsecured creditors.

> "However, the Trustee and the Bank recognize that it is possible that the **value of the Property may be less than the outstanding amount** owed to **the Bank** under the Promissory Note." [emphasis added]

28. On April 6, 2010 Attorney Madoff filed an EXPEDITED MOTION OF THE CHAPTER 7 TRUSTEE TO HOLD DEBTORS IN CONTEMPT; TO ORDER THE IMMEDIATE EVICTION OF THE DEBTORS; AND TO ENJOIN THE DEBTORS FROM FILING FURTHER PLEADINGS.  Attorney Madoff had an apparent stunning epiphany, on page 10, item 34, finally the **TRUTH** be told, there are currently **NO ASSETS**.

29. A hearing was held on July 20, 2010 wherein Attorney Madoff made it explicitly clear that Plaintiffs case is a NO ASSET case.

IN SUPPORT OF:

30. Plaintiffs have repeatedly challenged the standing of the BOC and the subject matter jurisdiction of the court.  Plaintiffs have repeatedly requested of the court to specifically identify where in the official court record that the standing of the BOC was established and where the court declared its Article III jurisdiction to proceed to the merit of the BOC's motion to convert Plaintiffs case.

"Because a court does not acquire jurisdiction **by a mere recital contrary to what is shown in the record", the record of the case is the determining factor as to whether a court has jurisdiction.** *State Bank of Lake Zurich v. Thill*, 113 Ill.2d 294, 497 N.E.2d 1156 (1986). [emphasis added]

A judge's allegation that he has subject-matter jurisdiction is only an allegation (*Lombard v. Elmore*, 134 Ill.App.3d 898, 480 N.E.2d 1329 (1st Dist. 1985); *Hill v. Daily*, 28 Ill.App.3d 202, 204, 328 N.E.2d 142 (1975)); **inspection of the record of the case has been ruled to be the controlling factor. If the record of the case does not support subject-matter jurisdiction, then the judge has acted without subject-matter jurisdiction.** *The People v. Brewer*, 328 Ill. 472, 483 (1928) ("**If it could not legally hear the matter upon the jurisdictional paper presented**, its finding that it had the power can add nothing to its authority, – **it had no authority to make that finding**."). [emphasis added]

31. The Doctrine of Precedent regarding standing was clearly established in the court In re: *Robin Hayes*.  Plaintiffs have included this case cite in numerous Mandatory Notices to this court.

In re *Anastasoff*: litigants' **constitutional rights are violated when courts depart from precedent where parties are similarly situated.  All litigants have a constitutional right to have their claims adjudicated according the rule of precedent**. See *Anastasoff v. United States*, 223 F.3d 898 (8th Cir. 2000). [emphasis added]

32. Plaintiffs case is similarly situated to In re: *Robin Hayes,* wherein the mortgage was recorded in the name of Mortgage Electronic Registration Systems, Inc., and not in the name of the BOC.  The claims of the BOC (Proofs of Claim) conflict with their own supporting documents.

33. Plaintiffs believe the BOC filed its motion to have Plaintiffs case converted in retaliation for Plaintiffs exercising their rights to demand evidentiary support.  No where in the official record of the court can Plaintiffs locate any testimony from a first hand competent fact witness, nor has there been any evidence entered into the official record from a competent fact witness.  Yet to spite this fact, the court has in almost 100% of the time ruled against Plaintiffs, to spite no responses to motions, or rebuttals to affidavits.

"Where there are no depositions, admissions, or affidavits the court has no facts to rely on for a summary determination." *Trinsey v. Pagliaro*, D.C. Pa. 1964, 229 F. Supp.

647. The court in *Trinsey* held that "**statements of counsel in their briefs or argument while enlightening to the Court are not sufficient for purposes of granting a motion to dismiss or summary judgment.**" Id. at 649. [emphasis added]

34. Pursuant to 18 U.S.C. § 155, Petitioners believe that the Chapter 7 Trustee, David Madoff, his attorney James Gross, the Bank of Canton, J Wesley Rawding, Senior Vice President, and their attorneys, Alan Braunstein and Mark Corner, have engaged in the conduct described under this statute.

## § **155**. Fee agreements in cases under title 11 and receiverships

Whoever, being a party in interest, whether as a debtor, **creditor**, receiver, **trustee** or **representative of any of them**, or attorney for any such party in interest, in any receivership or case under title 11 in any United States court or under its supervision, **knowingly and fraudulently enters into any agreement**, express or implied, with another such party in interest or attorney for another such party in interest, **for the purpose of fixing the fees or other compensation** to be paid to any party in interest or to any attorney for any party in interest for services rendered in connection therewith, **from the assets of the estate, <u>shall be fined under this title or imprisoned not more than one year, or both</u>.** (June 25, 1948, ch 645. § 1, 62 Stat. 690; May 24, 1949, ch 139, § 4, 63 Stat. 90; Nov. 6, 1978, P.L. 95-598, Title III, § 314(f), 92 Stat. 2677; Sept. 13, 1994, P.L. 103-322, Title XXXIII, § 330016, 108 Stat. 2146.) [emphasis added]

"**Trustees should abandon property that does not benefit estate; <u>"carve out" for sole purpose of creating trustee's commission for administering secured assets that should be abandoned will <em>no longer be approved</em></u>**; where Chapter 7 debtor filed notice of sale for $ 200,000 of realty which was subject to first mortgage exceeding that amount and second mortgage exceeding $ 51,000 and trustee did not object to sale but negotiated $ 1,000 carve out to cover administrative expenses and distribution to unsecured creditors, entire sale proceeds will be ordered turned over to first mortgagee and trustee will be denied compensation. In re Tobin (1996, BC DC RI) 202 BR 339, 37 CBC2d 52." [emphasis added]

35. Plaintiffs also believe, based on the stipulation agreement and the special "carve-out", knowing Plaintiffs real property was seriously underwater, the Defendants knowingly and willfully engaged in actions to deprive Plaintiffs of rights to fully adjudicate their claim with the conversion of their case, the immediate complaints filed by the Chapter 7 trustee against both Plaintiffs trust, trustee Mr. DuBois and Plaintiffs alleging criminal

wrongdoing, and to deprive Plaintiffs of their real property by a scheme or artifice to defraud.

36. Attorney Madoff has known from day one that Petitioners' real property was seriously underwater. Attorney Madoff has made no attempt to even determine the actual marketable value of Petitioners property and has repeatedly made statements to this court without any factual basis to support them.

37. Petitioners, as a result of their hiring a broker to assist them in finding a place to live, inquired of the broker if they had seen any listings pertaining to Petitioners' property. The broker responded that they had not seen any listings in the Multiple Listing Service (MLS) as late as June 25, 2010.

38. Per the settlement and stipulation agreements, Attorney Madoff was to market Petitioners property to first attempt to sell it privately. As noted above, Petitioners broker checked the MLS listings as late as June 25, 2010 and were unable to locate any listing of Petitioners property. Petitioners believe that this is a breach of the terms of the settlement.

39. Petitioners believe that it was never the intent of Attorney Madoff or the BOC to attempt to sell Petitioners property privately. To do so, there would have had to been a listing which would have included the "listing" price of the property. Petitioners believe that after Attorney Madoff's broker inspected the property on May 25, 2010, it was determined that the property would not support the stipulation agreement pay-outs. Petitioners firmly believe that is was the intent of Attorney Madoff and the BOC to wait until after June 30, 2010 to declare that Attorney Madoff attempted to have the property marketed and then simply to move to have Petitioners property liquidated at action where the BOC could make a "full credit bid". However, with this scenario, Petitioners fail to see how that will provide any benefit to the unsecured creditors. To spite whether the property is sold privately or through auction, Attorney Madoff was assured his $35,000 "carve out".

40. Pursuant to 11 U.S.C. § 704 (5), Attorney Madoff has a fiduciary duty to the estate, " if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper." Petitioners' case is replete with supporting documentation that

creates a clear controversy between the BOC's Proof of Claim and the supporting documentation submitted by the BOC to support their claim that conflicts with the claims stated in the BOC's proof of claim. Petitioners believe that Attorney Madoff has completely failed in his fiduciary duties to protect the interests of the estate and has violated not only this fiduciary duties outlined in section 704, but has also violated the provision under 18 U.S.C. § 1346, regarding "honest services".

**SCREWS v. U.S., 325 U.S. 91 (1945)**

Page 325 U. S. 105 - violates the statute not merely because he has a bad purpose, but because he acts in defiance of announced rules of law. He who defies a decision interpreting the Constitution knows precisely what he is doing. If sane, he hardly may be heard to say that he knew not what he did. Of course, willful conduct cannot make definite that which is undefined. But willful violators of constitutional requirements, which have been defined, certainly are in no position to say that they had no adequate advance notice that they would be visited with punishment. When they act willfully in the sense in which we use the word, they act in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite. When they are convicted for so acting, they are not punished for violating an unknowable something???The generality of the section made applicable as it is to deprivations of any constitutional right, does not obscure its meaning or impair its force within [313 U.S. 299, 329]    the scope of its application, which is restricted by its terms to deprivations which are willfully inflicted by those acting under color of any law, statute and the like.

An officer who acts in violation of the Constitution ceases to represent the government?. **Brookfield Const. Co. v. Stewart, 284 F. Supp. 94.** Furthermore, according to the First Circuit, a public official can steal honest services from his public employer in two ways: (1) the official can be influenced or otherwise improperly affected in the performance of his duties, or (2) the official can fail to disclose a conflict of interest, resulting in a personal gain. **U.S. v. Woodward, 149 F.3d 46, 57 (1st Cir. 1998) (relying upon the court's earlier decision in U.S. v. Sawyer, 85 F.3d 713, 724 (1st Cir. 1996).**

In U.S. v. Bloom, 149 F.3d 649, 655 (7th Cir. 1998) The Seventh Circuit has held that "[m]isuse of office (more broadly, misuse of position) for private gain is the line that separates run of the mill violations of state law fiduciary duty . . . from federal crime." The court went on to note that "in almost all of the intangible rights cases decided . . . (before McNally or since ? 1346), the defendant used his office for private gain" but also noted that "secret conversion of information received in a fiduciary capacity is a form of fraud against the owner of that information."

41. Petitioners believe they have the absolute right to "honest services" as provided for under 18 U.S.C. § 1346. McNally v United States, 483 U.S. 350 (1987), and the cases cited above made this explicitly clear.

42. Based on the attached appraisals it is abundantly clear that Petitioners' real property is grossly underwater and should be abandoned pursuant to 11 U.S.C. § 554, unless Attorney Madoff can provide some factual evidence, such as an appraisal countering Petitioners' appraisal to continue his baseless claim that the estate will provide distributable assets to the unsecured creditors.

## COUNT I
### 18 U.S.C § 155 - Fee agreements in cases under title 11 and receiverships

43. The Plaintiffs repeat and re-allege Paragraphs 1 through 42 as if fully set forth herein.

44. Plaintiffs allege that the above named individuals entered in a contract that specifically provided for a $35,000 special "carve-out" fee for Attorney Madoff for a case that was clearly a NO ASSET case from the inception of the conversion.

45. As a result of the actions of the above named Plaintiffs have been caused injury and have suffered greatly as a result of these actions and continue to suffer as a result of the over extended proceedings and threat of their loss of estate and equity.

## COUNT II
### 18 U.S.C. § 241 - Conspiracy Against Rights

46. The Plaintiffs repeat and re-allege Paragraphs 43 through 45 as if fully set forth herein.

47. Plaintiffs allege that with the almost immediate filing of "verified" complaints against Plaintiffs and Plaintiff Diane Reynolds' trust and trustee, Mr. Leo DuBois, were in actuality "strike suits" specifically geared to chill Plaintiffs rights to fully adjudicate the claim of the BOC.

48. As a result of the actions of the above named Plaintiffs have been caused injury and have suffered greatly as a result of these actions and continue to suffer as a result of the over extended proceedings and threat of their loss of estate and equity.

## COUNT III
### 18 U.S.C. § 242 - Deprivation of Rights under Color of Law

49. The Plaintiffs repeat and re-allege Paragraphs 46 through 48 as if fully set forth herein.

50. Plaintiffs allege that with the almost immediate filing of "verified" complaints by the Chapter 7 Trustee, against Plaintiffs and Plaintiff Diane Reynolds' trust and trustee, Mr. Leo DuBois, were in actuality "strike suits" specifically geared to chill Plaintiffs rights, under threat of criminal prosecution, to fully adjudicate the claim of the BOC.

51. As a result of the actions of the above named Plaintiffs have been caused injury and have suffered greatly as a result of these actions and continue to suffer as a result of the over extended proceedings and threat of their loss of estate and equity.

## COUNT IV
### 18 U.S.C. § 1341 – Frauds and Swindles

52. The Plaintiffs repeat and re-allege Paragraphs 49 through 51 as if fully set forth herein.

53. Plaintiffs believe that the BOC knowingly and willing conspired to enter into agreement (the "stipulation agreement") with the Chapter 7 Trustee, with the intent to defraud Plaintiffs by scheme or artifice, to defraud Plaintiff of their real property.

54. As a result of the actions of the above named Plaintiffs have been caused injury and have suffered greatly as a result of these actions and continue to suffer as a result of the over extended proceedings and threat of their loss of estate and equity.

## COUNT V
### 18 U.S.C. § 1346 - Honest Services
### (Chapter 7 Trustee only)

55. The Plaintiffs repeat and re-allege Paragraphs 52 through 54 as if fully set forth herein.

56. Plaintiffs were deprived "honest services" by the Chapter 7 Trustee in the administration of Plaintiffs estate wherein the Chapter 7 Trustee failed to perform his fiduciary duty by examining the BOC claim for improper purpose where there were conflicting statement made by the BOC.

57. As a result of the actions of the above named Plaintiffs have been caused injury and have suffered greatly as a result of these actions and continue to suffer as a result of the over extended proceedings and threat of their loss of estate and equity.

## COUNT VI
### 18 U.S.C. § 876 – Mailing Threatening Communications

58. The Plaintiffs repeat and re-allege Paragraphs 55 through 57 as if fully set forth herein.

59. Plaintiffs allege that Defendants caused to be place in the mail, the settlement and stipulation agreement with the intent to extort from Plaintiffs their real property.

60. As a result of the actions of the above named Plaintiffs have been caused injury and have suffered greatly as a result of these actions and continue to suffer as a result of the over extended proceedings and threat of their loss of estate and equity.

## COUNT VII
### 18 U.S.C. § 880 – Receiving the Proceeds of extortion
### (Chapter 7 Trustee only)

61. The Plaintiffs repeat and re-allege Paragraphs 58 through 60 as if fully set forth herein.

62. Plaintiffs allege that the Chapter 7 Trustee received Plaintiffs real property by unlawful means when Plaintiffs trust was dissolved as a result of the Trustee's actions.

63. As a result of the actions of the above named Plaintiffs have been caused injury and have suffered greatly as a result of these actions and continue to suffer as a result of the over extended proceedings and threat of their loss of estate and equity.

## COUNT VIII

Verified Criminal Complaint
Page 12 of 16

18 U.S.C. § 645 – Court Officers Generally
(Chapter 7 Trustee only)

64. The Plaintiffs repeat and re-allege Paragraphs 61 through 63 as if fully set forth herein.

65. Plaintiffs allege that the Chapter 7 Trustee, David Madoff, used his office to dissolve Plaintiff trust, and with the settlement and stipulation agreements has converted to his own use Plaintiffs real property wherein Attorney Madoff will receive $35,000 for liquidating Plaintiffs real property.

66. As a result of the actions of the above named Plaintiffs have been caused injury and have suffered greatly as a result of these actions and continue to suffer as a result of the over extended proceedings and threat of their loss of estate and equity.

COUNT IX
18 U.S.C. § 654 – Officer or Employee of United States Converting Property of Another
(Chapter 7 Trustee only)

67. The Plaintiffs repeat and re-allege Paragraphs 64 through 66 as if fully set forth herein.

68. Plaintiffs allege that the Chapter 7 Trustee, David Madoff, used his office to dissolve Plaintiff trust, and with the settlement and stipulation agreements has converted to his own use Plaintiffs real property wherein Attorney Madoff will receive $35,000 for liquidating Plaintiffs real property.

69. As a result of the actions of the above named Plaintiffs have been caused injury and have suffered greatly as a result of these actions and continue to suffer as a result of the over extended proceedings and threat of their loss of estate and equity.

COUNT X
18 U.S.C. § 1951 – Interference with Commerce by Threats or Violence
(Chapter 7 Trustee only)

70. The Plaintiffs repeat and re-allege Paragraphs 67 through 69 as if fully set forth herein.

71. Plaintiff allege that the Chapter 7 Trustee under threat of criminal prosecution extorted from Plaintiff trust their real property in furtherance of the Chapter 7 Trustee's plan to convert for his own use or benefit Plaintiffs real property.

72. As a result of the actions of the above named Plaintiffs have been caused injury and have suffered greatly as a result of these actions and continue to suffer as a result of the over extended proceedings and threat of their loss of estate and equity.

## COUNT X
18 U.S.C. § 1951 – Interference with Commerce by Threats or Violence
(Chapter 7 Trustee only)

73. The Plaintiffs repeat and re-allege Paragraphs 70 through 72 as if fully set forth herein.

74. Plaintiff allege that the Chapter 7 Trustee under threat of criminal prosecution extorted from Plaintiff trust their real property in furtherance of the Chapter 7 Trustee's plan to convert for his own use or benefit Plaintiffs real property.

"The term "criminally derived property: means any property constituting, or derived from, proceeds obtained from a criminal offense.."

75. As a result of the actions of the above named Plaintiffs have been caused injury and have suffered greatly as a result of these actions and continue to suffer as a result of the over extended proceedings and threat of their loss of estate and equity.

RELIEF

76. Plaintiffs move this court to stay the execution of the Settlement and Stipulation agreements until Plaintiffs complaint can be fully adjudicated.

77. Plaintiff further move this court for damages Plaintiffs are entitled to as a matter of law, and for emotional distress, pain and suffering.

JUL 23'10 PM12:35 USB

Respectfully submitted,

Barry Reynolds, Propria Persona

Diane Reynolds, Propria Persona
4 Alberta Lane
Lakeville, Massachusetts
Tele: 774-766-7350
Email: smores74@hotmail.com

Date: July _22_, 2010

Further, Affiant saith not,

The Affiant has read this Affidavit and hereby states that it represents exactly what was intended to say by the Affiant.

DATED:  the _22_, day of the July, 2010.

Diane Reynolds
4 Alberta Lane
Lakeville, Massachusetts

JURAT:

State of Massachusetts          }
                                }  ss.
County Plymouth                 }

SUBSCRIBED AND SWORN TO before me by Diane Reynolds and she substantiates the authenticity of the Affidavit as true and correct and verifies this statement as what it was intended to say on this _____ day of July, 2010.

Notary Public for Massachusetts

My Commission Expires: Sept 12, 2012



Verified Criminal Complaint
Page 15 of 16

JUL 23'10 PM 12:35 USB

Further, Affiant saith not,

The Affiant has read this Affidavit and hereby states that it represents exactly what was intended to say by the Affiant.

DATED:  the ___*JJ*___ , day of the July, 2010.

_____
Barry Reynolds
4 Alberta Lane
Lakeville, Massachusetts

JURAT:

State of Massachusetts      }
                            } ss.
County *Plymouth*           }

SUBSCRIBED AND SWORN TO before me by Barry Reynolds and he substantiates the authenticity of the Affidavit as true and correct and verifies this statement as what it was intended to say on this ___*JJ*___ day of July, 2010.

_____
Notary Public for Massachusetts

My Commission Expires: *Sept 21, 2012*

## INVOICE    EXHIBIT "A"

Date:   05/13/09

File No.   905090
Case No.

Prepared for:

Mr. Barry Reynolds
4 Alberta Lane
Lakeville, Ma 02347

Property Appraised:

N/A
4 Alberta Lane
Lakeville, Ma  02347

Work Performed:

| | | |
|---|---|---|
| Single Family Appraisal Report | $ | 300.00 |
| | $ | |
| paid by check | $ | -300.00 |
| | $ | |
| | $ | |
| 6567 | $ | |
| Total Amount Due: | $ | 0.00 |

Please make checks payable to:

Bankers Residential
408 Wareham Street
Middleboro, Ma 02346

Bankers Residential
408 Wareham Street
Middleboro, Ma 02346

---

05/13/09

Mr. Barry Reynolds
4 Alberta Lane
Lakeville, Ma 02347

RE:      N/A
         4 Alberta Lane
         Lakeville, Ma  02347
File No.  905090
Case No.

Dear  Mr. Reynolds,

In accordance with your request, I have personally inspected and prepared an appraisal report of the real
property located at:

                    4 Alberta Lane, Lakeville, Ma  02347

The purpose of this appraisal is to estimate the market value of the property described in the body of this
appraisal report.

Enclosed, please find the appraisal report which describes certain data gathered during our investigation
of the property.  The methods of approach and reasoning in the valuation of the various physical and
economic factors of the subject property are contained in this report.

An inspection of the property and a study of pertinent factors, including valuation trends and an analysis of
neighborhood data, led the appraiser to the conclusion that the market value, as of  05/11/09
is:

                    $          309,000

The opinion of value expressed in this report is contingent upon the limiting conditions attached to this
report.

It has been a pleasure to assist  you.  If I may be of further service to you in the future, please let me know.

Respectfully submitted,

Signature:

Douglas Sousa
Ma.Cert.Residential R.E. Appraiser #70798

5/6/2010

File No.   905090
Case No.

# Residential Appraisal Report

The purpose of this summary appraisal report is to provide the client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address 4 Alberta Lane | | City | Lakeville | | State  Ma | Zip Code | 02347 |

**SUBJECT**

| Owner   Dubois/D'Amber Trust | Intended User   Mr. Barry Reynolds | County   Plymouth |
|---|---|---|

Legal Description Book 35373 Page 227 @ Plymouth County Registry of Deeds (12/06/07)

| Assessor's Parcel #   Map 6 Block 2 Lot 2M | Tax Year   2009 | R.E. Taxes $ 5,754.74 |
|---|---|---|

| Neighborhood Name  None | Map Reference   6 | Census Tract   5401.00 |
|---|---|---|

Occupant  [X] Owner  [ ] Tenant  [ ] Vacant  Special Assessments $   None   [ ] PUD  HOA $  N/A   [ ] per year  [ ] per month

Property Rights Appraised  [X] Fee Simple  [ ] Leasehold  [ ] Other (describe)

Intended Use  estimate of market value - NOT TO BE USED FOR MORTGAGE FINANCING

Client  Mr. Barry Reynolds   Address  4 Alberta Lane, Lakeville, Ma 02347

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?  [ ] Yes  [X] No

Report data source(s) used, offerings price(s), and date(s).   No listing of the subject is noted over the past 12 months per MLS.

**CONTRACT**

I  [ ] did  [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.  N/A

| Contract Price $   N/A | Date of Contract   N/A | Is the property seller the owner of public record?  [ ] Yes  [ ] No  Data Source(s)  N/A |
|---|---|---|

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the purchaser?  [ ] Yes  [ ] No
If Yes, report the total dollar amount and describe the items to be paid.  N/A

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location | Urban [ ] Suburban [X] Rural [ ] | | Property Values | Increasing [ ] Stable [X] Declining [ ] | PRICE $ (000) | AGE (yrs) | One-Unit | 69 % |
| Built-Up | Over 75% [X] 25-75% [ ] Under 25% [ ] | | Demand/Supply | Shortage [ ] In Balance [X] Over Supply [ ] | 200  Low | New | 2-4 Unit | 0 % |
| Growth | Rapid [ ] Stable [X] Slow [ ] | | Marketing Time | Under 3 mths [ ] 3-6 mths [X] Over 6 mths [ ] | 650  High | 200 | Multi-Family | 0 % |
| | | | | | 400  Pred. | 50 | Commercial | 1 % |
| | | | | | | | Other Vacant | 30 % |

Neighborhood Boundaries   The neighborhood boundaries are considered to be: Precinct St. to the North, Route 18 to the East, Pierce Ave. to the West, and Highland Rd. to the South.

Neighborhood Description   The neighborhood is comprised primarily of single family dwellings varying in age, size & style. Commercial influence is retail/service shops along main roadways. Access to highways, centers of employment, schools & shopping is average. Alberta Lane is located within an established subdivision offering average appeal in the local market.

Market Conditions (including support for the above conclusions)   Property values in most local market segments have experienced a decline on a year over year basis. Although marketing times are typically below six months, the supply of homes on the market exceeds demand. The availability of financing and foreclosures are responsible for some of the decrease in the volume of sales.

**SITE**

| Dimensions   See attached plat map addendum | Area   3.57 Acres +/- | Shape   Flag-Shaped | View   Nbhd/Woods |
|---|---|---|---|

Specific Zoning Classification   Residential   Zoning Description  70,000 Sf. minimum lot size w/175' St. Ftg. for single family use.

Zoning Compliance  [X] Legal  [ ] Legal Nonconforming (Grandfathered Use)  [ ] No Zoning  [ ] Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use?  [X] Yes  [ ] No  If No, describe.  N/A

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements--Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [ ] | [X] Private | Street  Asphalt | [X] | |
| Gas | | | Sanitary Sewer | [ ] | [X] Private | Alley  None | | |

FEMA Special Flood Hazard Area  [ ] Yes  [X] No  FEMA Flood Zone  C   FEMA Map #  250271 0010B   FEMA Map Date  05/84

Are the utilities and/or off-site improvements typical for the market area?  [X] Yes  [ ] No  If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?  [ ] Yes  [X] No  If Yes, describe.

The lot is subject to a drainage easement. This is not adverse. No adverse easements, encroachments or special conditions were noted. Private well & sewerage systems are typical & not adverse in the local market. Municipal water & sewerage services are not available at the subject location. The lot is gently rolling with no adverse site factors noted.

**IMPROVEMENTS**

| General Description | | Foundation | | Exterior Description   materials/condition | Interior   materials/condition |
|---|---|---|---|---|---|
| Units  [X] One  [ ] One with Accessory Unit | | [ ] Concrete Slab  [ ] Crawl Space | | Foundation Walls  Concrete/ApGood | Floors   HW/Tile/SubFlr |
| # of Stories  1.5 | | [X] Full Basement  [ ] Partial Basement | | Exterior Walls  Stucco/GdAvg | Walls   Plaster |
| Type  [ ] Det.  [X] Att.  [ ] S-Det./End Unit | | Basement Area  3239  sq. ft. | | Roof Surface  Asphalt/ApGood | Trim/Finish  Wood |
| [X] Existing  [ ] Proposed  [ ] Under Const. | | Basement Finish  0  % | | Gutters & Downspouts  Alum/Alum/Good | Bath Floor  Tile |
| Design (Style)  Contemporary | | [X] Outside Entry/Exit  [ ] Sump Pump | | Window Type  Casement/Good | Bath Wainscot  Tile/Fbgl |
| Year Built  2004 +/- | | Evidence of  [ ] Infestation | | Storm Sash/Insulated  Thermal/Good | Car Storage  None |
| Effective Age (Yrs)  3 | | [ ] Dampness  [ ] Settlement | | Screens  Aluminum/Good | [X] Driveway  # of Cars  3+ |
| Attic  [ ] None | | Heating [ ] FWA  [ ] HWBB  [X] Radiant | Amenities | Woodstove(s) # | Driveway Surface  Gravel |
| [ ] Drop Stair  [X] Stairs | | [ ] Other  Fuel  Oil | [X] Fireplace(s) # 1  [X] Fence | [ ] Garage  # of Cars  3 |
| [ ] Floor  [ ] Scuttle | | Cooling  [X] Central Air Conditioning | [X] Patio/Deck  [ ] Porch | [ ] Carport  # of Cars |
| [ ] Finished  [ ] Heated | | [ ] Individual  [ ] Other  CAC | [ ] Pool  [ ] Other | [ ] Att.  [ ] Det.  [ ] Built-in |
| Appliances  [ ] Refrigerator  [X] Range/Oven  [ ] Dishwasher  [ ] Disposal  [ ] Microwave  [ ] Washer/Dryer  [ ] Other (describe)  P = Personal | | | | | |

Finished area **above** grade contains:   15  Rooms   5  Bedrooms   5.50  Bath(s)   4,585  Square Feet of Gross Living Area Above Grade

File No.   905090
Case No.

# Residential Appraisal Report

| | | | |
|---|---|---|---|
| There are **9** comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 514,900 to $ 799,900 | | | |
| There are **3** comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 519,900 to $ 630,000 | | | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Address | 4 Alberta Lane<br>Lakeville, Ma 02347 | 7 Dunham Pond Road<br>Lakeville, Ma 02347 | Lot 8 Deerfield Lane<br>Lakeville, Ma 02347 | 8 Deerfield Lane<br>Lakeville, Ma 02347 |
| Proximity to Subject | | 3.08 miles NE | 4.47 miles NE | 4.53 miles NE |
| Sale Price | $ N/A | $ 630,000 | $ 592,027 | $ 519,900 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 206.42 sq. ft. | $ 175.94 sq. ft. | $ 216.63 sq. ft. |
| Data Source(s) | Inspection | B & T/Assessor/MLS | MLS/Assessor | B & T/Assessor/MLS |
| Verification Source(s) | Assessor | Registry of Deeds | Registry of Deeds | Registry of Deeds |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Sale or Financing | N/A | None | | None | | None | |
| Concessions | | Disclosed | | Disclosed | | Disclosed | |
| Date of Sale/Time | N/A | 10/31/08 (3.5%) | -22,000 | 02/19/09 (1.5%) | -8,900 | 09/29/08 (4%) | -20,800 |
| Location | Average | Superior | -50,000 | Similar | | Similar | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 3.57 Acres +/- | 1.61 Acres +/- | +10,000 | 1.62 Acres +/- | +10,000 | 1.67 Acre +/- | +10,000 |
| View | Nbhd/Woods | Golf Course/Nbhd | No adj. | Nbhd/Woods | | Nbhd/Woods | |
| Design (Style) | Contemporary | Colonial | | Colonial | | Colonial | |
| Quality of Construction | Good | Similar | | Similar | | Inferior | +50,000 |
| Actual Age | 5 +/- | 8 +/- | | New | -10,000 | New | -10,000 |
| Condition | Good | Similar | | Similar | | Similar | |
| Above Grade | Total 15 | Bdrms 5 | Baths 5.50 | Total 11 | Bdrms 4 | Baths 2.50 | +15,000 | Total 8 | Bdrms 4 | Baths 2.50 | +15,000 | Total 10 | Bdrms 4 | Baths 2.50 | +15,000 |
| Room Count | | | | | | | |
| Gross Living Area | 4,585 sq. ft. | 3,052 sq. ft. | +30,700 | 3,365 sq. ft. | +24,400 | 2,400 sq. ft. | +43,700 |
| Basement & Finished | Full | Full | | Full | | Full | |
| Rooms Below Grade | Unfinished | Unfinished | | Unfinished | | Unfinished | |
| Functional Utility | Incomplete | Superior | -300,000 | Superior | -300,000 | Superior | -300,000 |
| Heating/Cooling | Radiant/CAC | FHW/CAC | | FWA/CAC | | FWA/CAC | |
| Energy Efficient Items | None Noted | None Noted | | None Noted | | None Noted | |
| Garage/Carport | 3 Car Att. | 4 Car Att. | -5,000 | 2 Car Att. | +5,000 | 2 Car Att./Bonus | No adj. |
| Porch/Patio/Deck | Porches/Deck | Porches/Patio | No adj. | Porches/Deck | | Porches/Deck | |
| Fireplace | 1 Fireplace | 1 Fireplace | | 1 Fireplace | | 1 Fireplace | |
| Amenities | Amenities | Amenities | | Amenities | | Amenities | |
| Net Adjustment (Total) | | + X - | $ -321,300 | + X - | $ -264,500 | + X - | $ -212,100 |
| Adjusted Sale Price<br>of Comparables | | Net Adj: -51%<br>Gross Adj: 69% | $ 308,700 | Net Adj: -45%<br>Gross Adj: 63% | $ 327,527 | Net Adj: -41%<br>Gross Adj: 86% | $ 307,800 |

I **X did** did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research **X did** did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s) B & T, MLS and assessor records

My research **X did** did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s) B & T, MLS and assessor records

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 12/06/07 | No other transfer noted | 09/29/08 | 09/29/08 |
| Price of Prior Sale/Transfer | $1 Transfer of title | over past 12 months. | $800,000 | $800,000 |
| Data Source(s) | (B & T/Assessor Records) | (B & T/Assessor Records) | (B & T/Assessor Records) | (B & T/Assessor Records) |
| Effective Date of Data Source(s) | Current | Current | Current | Current |

Analysis of prior sale or transfer history of the subject property and comparable sales   A transfer of title for nominal consideration is noted on 12/06/07. No other sale or transfer of the subject is noted over the past 3 yrs/36 mos per B & T, MLS and assessor records. Sales 2 & 3 were acquired as part of a bulk land purchase as noted. No other sales or transfers of the comparable sales are noted over the past twelve months per B & T and MLS and assessor records.

Summary of Sales Comparison Approach   GLA was adj.@ $20 per sf., rounded, reflective of the subject's super-adequate size. Time adjs.reflect declining values. Sale 1 is in a subdivision offering superior locational appeal. Site adjs.reflect size, utility & privacy. Sale 3 lacks many of the quality features evident in the subject & other comparable sales; hence, the adj.for quality. Sales 2 & 3 were adjusted for age reflective of the enhanced market appeal of new homes. No bedroom adjs.were warranted as this was considered with the GLA adjustment. All sales were adjusted for functional utility reflective of the estimated cost to complete the subject improvements. Desirable distance, time, GLA & gross/net/line adj.guidelines

*SALES COMPARISON ANALYSIS*

File No.   905090
Case No.

# Residential Appraisal Report

ADDITIONAL COMMENTS

The subject is a partially completed contemporary style dwelling. The subject requires finished flooring, finished trim work, finished exterior siding, gutters, finished walls, landscaping, etc. The estimated cost to complete is $300,000. Please note that the appraiser is not a contractor. Neither has a contractor been employed to provide an estimate to the appraiser. The estimate is based upon the appraiser's inspection of the subject property, information provided by the owner as well as conversations with local builders. The estimate is not offered as a guarantee of the actual cost to complete the subject property. Nonetheless, the appraiser feels confident that it reflects the market reaction to the unfinished nature of the subject property.

INTENDED USER: The Intended User of this appraisal report is Mr.Barry Reynolds. The Intended User is to evaluate the property value of the subject of this appraisal subject to the stated scope of work, purpose of the appraisal, reporting requirements of this appraisal report form, and definition of market value. THIS APPRAISAL IS NOT TO BE USED FOR MORTGAGE FINANCING PURPOSES. No additional Intended Users are identified by the appraiser. Please note that possession of this report does not create a client-appraiser relationship.

COMPARABLE SALES : The appraiser provided the most recent similar sales available. Additional sales were reviewed,but not selected as they were either less similar overall to the subject or they were dated sales which were considered less reliable. The lack of closer and/or more recent similar sales is not reflective of any adverse factors affecting the local real estate market. It is reflective of local development patterns and of the diverse local housing stock.

HAZARDOUS-TOXIC MATERIALS :    The appraiser does not have the expertise to conduct any tests for the presence of hazardous materials, nor have any such tests been performed for the appraiser. Should the client have any concerns regarding the presence of asbestos,radon,toxic mold and/or other hazardous materials on site or in the dwelling, the appraiser advises that the client retain an expert in the specific field to conduct the desired tests. It is an assumption of this appraisal that no hazardous conditions are present. EVIDENCE TO THE CONTRARY WOULD NULLIFY THE ESTIMATE OF MARKET VALUE AS DEFINED BY THIS APPRAISAL REPORT.

The use of well water is typical and not adverse in the subject town. Public water services are not available at the subject location. It is an express assumption of this appraisal that the well water used on site is of sufficient quality and quantity for domestic needs. EVIDENCE TO THE CONTRARY WOULD NULLIFY THE ESTIMATE OF MARKET VALUE AS DEFINED BY THIS APPRAISAL REPORT.

The subject is serviced by a private, on-site sewerage system. This is acceptable in the local market. Municipal sewer service is not available. While the appraiser saw  no evidence of a problem with, or seepage from the private sewer system, the appraiser is not an expert in the field. It is an express assumption of this appraisal that the subject's sewerage system conforms with state Title V regulations. EVIDENCE TO THE CONTRARY WOULD NULLIFY THE ESTIMATE OF MARKET VALUE AS DEFINED BY THIS APPRAISAL REPORT. A system which does not comply with these regulations may impact the market value and/or marketability of a property. The use of a qualified professional is required to render any determinations of compliance with Title V.  Such inspections are typically performed only at the time of the sale of a property.

## COST APPROACH TO VALUE (if applicable)

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)   Recent area land sales were reviewed in estimating the subject's site value. Please note that the Cost Approach is applied as a tool in the valuation process and is not intended to represent insurance replacement cost or for any other purpose.

| ESTIMATED | | REPRODUCTION OR | X | REPLACEMENT COST NEW | OPINION OF SITE VALUE | | | =$ | 160,000 |
|---|---|---|---|---|---|---|---|---|---|
| Source of cost data  Local & area builders & contractors | | | | | Dwelling | 4,585 | Sq. Ft. @ $ 103.85 | =$ | 476,152 |
| Quality rating from cost service    Good    Effective date of cost data    Current | | | | | Bsmt. | 3,239 | Sq. Ft. @ $ 11.10 | =$ | 35,953 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | | | | Fpl/CAC/Stoops | | | | 15,650 |
| GLA data is on the sketch addendum. The land to value ratio is typical for | | | | | Garage/Carport | 725 | Sq. Ft. @ $ 37.50 | =$ | 27,188 |
| the area and reflective of its desirability. Local & area builders and | | | | | Total Estimate of Cost-new | | | =$ | 554,943 |
| contractors were used as a guide in estimating replacement costs. The | | | | | Less    Physical 5 | Functional 57 | External | | |
| economic life basis is 60 years. The estimated remaining economic life is | | | | | Depreciation 27,747 | 300,000 | 0 | =$ ( | 327,747 ) |
| 57 years. Physical depreciation was calculated by the Age/Life Method | | | | | Depreciated Cost of Improvements | | | =$ | 227,196 |
| (3/60=5%). Functional depr. reflects the estimated cost to complete the | | | | | "As-is" Value of Site Improvements | | | =$ | 28,500 |
| subject improvements. | | | | | | | | | |
| Estimated Remaining Economic Life (HUD and VA only)    57    Years | | | | | Indicated Value By Cost Approach | | | =$ | 415,696 |

## INCOME APPROACH TO VALUE (if applicable)

| Estimated Monthly Market Rent $    N/A    X Gross Multiplier | =$    N/A    Indicated Value by Income Approach |
|---|---|

Summary of Income Approach (including support for market rent and GRM)

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? | Yes | No | Unit type(s) | Detached | Attached

File No.   905090
Case No.

This appraisal report is subject to the scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. The Appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment.

## SCOPE OF WORK:
The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

## DEFINITION OF MARKET VALUE:
As per Fannie Mae the definition of market value is the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

## STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:
The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

File No.   905090
Case No.

21. I am aware that any disclosure or distribution of this appraisal report by me or the client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

22. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

## SUPERVISORY APPRAISER'S CERTIFICATION: The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

*Heather Ahumer   5/6/2010*
*Notary Exp 4/17/2016*

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name   Douglas Sousa | Name |
| Company Name Bankers Residential | Company Name |
| Company Address  408 Wareham Street | Company Address |
| Middleboro, Ma 02346 | |
| Telephone Number (508) 923-0205 | Telephone Number |
| Email Address dougsousa@bankersresidential.com | Email Address |
| Date of Signature and Report 05/13/09 | Date of Signature |
| Effective Date of Appraisal 05/11/09 | State Certification # |
| State Certification #  70798 Residential | or State License # |
| or State License # | State |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License |
| State   MA | |
| Expiration Date of Certification or License 12-29-2010 | |

## Appraiser License Certificate

File No.    905090
Case No.

COMMONWEALTH OF MASSACHUSETTS

DIVISION OF PROFESSIONAL LICENSURE

## OF REAL ESTATE APPRAISER
## CERT RES. REAL ESTATE APPRAISER

ISSUES THIS LICENSE TO

DOUGLAS SOUSA

48 GERTRUDE ST

SOMERSET        MA 02726-3529

70798        12/29/10        382337

Bankers Residential

## SUBJECT PHOTO ADDENDUM

File No.   905090
Case No.

Borrower   N/A
Property Address   4 Alberta Lane
City   Lakeville        County        Plymouth        State        Ma        Zip Code        02347
Lender/Client   Mr. Barry Reynolds                Address    4 Alberta Lane, Lakeville, Ma 02347



**FRONT OF
SUBJECT PROPERTY**
 4 Alberta Lane
 Lakeville, Ma



**REAR OF
SUBJECT PROPERTY**



**STREET SCENE**

Bankers Residential
COMPARABLES 1-2-3

File No.   905090
Case No.

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 4 Alberta Lane | | | | | | |
| City  Lakeville | | County | Plymouth | State | Ma | Zip Code | 02347 |
| Lender/Client | Mr. Barry Reynolds | | Address | 4 Alberta Lane, Lakeville, Ma 02347 | | | |



**COMPARABLE SALE #**    1

7 Dunham Pond Road
Lakeville, Ma 02347



**COMPARABLE SALE #**    2

Lot 8 Deerfield Lane
Lakeville, Ma 02347



**COMPARABLE SALE #**    3

8 Deerfield Lane
Lakeville, Ma 02347

Bankers Residential
## PLAT MAP

File No.    905090
Case No.

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower    N/A | | | | | | |
| Property Address    4 Alberta Lane | | | | | | |
| City    Lakeville | County | Plymouth | State | Ma | Zip Code | 02347 |
| Lender/Client    Mr. Barry Reynolds | | | Address    4 Alberta Lane, Lakeville, Ma 02347 | | | |



Bankers Residential
## SKETCH ADDENDUM

File No.    905090
Case No.

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 4 Alberta Lane | | | | | | |
| City | Lakeville | County | Plymouth | State | Ma | Zip Code | 02347 |
| Lender/Client | Mr. Barry Reynolds | | Address | 4 Alberta Lane, Lakeville, Ma 02347 | | | |



Bankers Residential
## SKETCH ADDENDUM

File No.   905090
Case No.

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 4 Alberta Lane | | | | | | |
| City Lakeville | | County | Plymouth | State | Ma | Zip Code | 02347 |
| Lender/Client | Mr. Barry Reynolds | | | Address | 4 Alberta Lane, Lakeville, Ma 02347 | | |



|  | SKETCH CALCULATIONS | Perimeter | Area |
|---|---|---|---|
| A1 : 6.0 x 1.0 = | | | 6.0 |
| A2 : 14.0 x 5.0 = | | | 70.0 |
| A3 : 17.0 x 15.0 = | | | 255.0 |
| A4 : 12.0 x 2.0 = | | | 24.0 |
| A5 : 66.0 x 2.0 = | | | 132.0 |
| A6 : 0.5(57.0 + 58.0)x1.0 = | | | 57.5 |
| A7 : 0.5(74.0 + 75.0)x1.0 = | | | 74.5 |
| A8 : 0.5(75.0 + 72.9)x3.0 = | | | 221.8 |
| A9 : 0.5(69.9 + 68.4)x2.0 = | | | 138.3 |
| A10 : 0.5(69.4 + 68.0)x2.0 = | | | 137.4 |
| A11 : 37.0 x 3.0 = | | | 111.0 |
| A12 : 24.0 x 16.0 = | | | 384.0 |
| A13 : 12.0 x 1.0 = | | | 12.0 |
| A14 : 68.0 x 1.0 = | | | 68.0 |
| A15 : 23.0 x 2.0 = | | | 46.0 |
| A16 : 22.0 x 4.0 = | | | 88.0 |
| A17 : 12.0 x 8.0 = | | | 96.0 |
| A18 : 0.5 x 5.0x5.0 = | | | 12.5 |
| A19 : 13.0 x 5.0 = | | | 65.0 |
| A20 : 0.5 x 3.0x3.0 = | | | 4.5 |
| A21 : 0.5 x 2.4x3.0 = | | | 3.6 |
| A22 : 21.0 x 3.0 = | | | 63.0 |
| A23 : 0.5 x 1.6x2.0 = | | | 1.6 |
| A24 : 26.4 x 2.0 = | | | 52.8 |
| A25 : 0.5 x 9.0x4.0 = | | | 18.0 |
| A26 : 57.0 x 4.0 = | | | 228.0 |
| A27 : 0.5 x 4.0x4.0 = | | | 8.0 |
| A28 : 61.0 x 4.0 = | | | 244.0 |
| A29 : 0.5 x 9.0x9.0 = | | | 40.5 |
| A30 : 64.0 x 9.0 = | | | 576.0 |

## LOCATION MAP ADDENDUM

File No.     905090

Case No.

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower     N/A | | | | | | |
| Property Address     4 Alberta Lane | | | | | | |
| City   Lakeville | County | Plymouth | State | Ma | Zip Code | 02347 |
| Lender/Client    Mr. Barry Reynolds | | Address   4 Alberta Lane, Lakeville, Ma 02347 | | | | |



# INVOICE         EXHIBIT "B"

Date:    06/22/10                                    File No.    1006223
                                                     Case No.

Prepared for:

    Mr. Barry Reynolds
    4 Alberta Lane
    Lakeville, Ma 02347

Property Appraised:

    N/A
    4 Alberta Lane
    Lakeville, Ma  02347

Work Performed:

| Description | | Amount |
|---|---|---|
| Update of Value | $ | 200.00 |
| | $ | |
| paid by check | $ | -200.00 |
| | $ | |
| | $ | |
| 6567 | $ | |
| Total Amount Due: | $ | 0.00 |

Please make checks payable to:

    Bankers Residential
    408 Wareham Street
    Middleboro, Ma 02346

Bankers Residential
408 Wareham Street
Middleboro, Ma 02346

---

06/22/10

Mr. Barry Reynolds
4 Alberta Lane
Lakeville, Ma 02347

RE      N/A
        4 Alberta Lane
        Lakeville, Ma  02347
File No.   1006223
Case No.

Dear

In accordance with your request, I have personally inspected and prepared an appraisal report of the real property located at:

4 Alberta Lane, Lakeville, Ma  02347

The purpose of this appraisal is to estimate the market value of the property described in the body of this appraisal report.

Enclosed, please find the *appraisal report* which describes certain data gathered during our investigation of the property.  The methods of approach and reasoning in the valuation of the various physical and economic factors of the subject property are contained in this report.

An inspection of the property and a study of pertinent factors, including valuation trends and an analysis of neighborhood data, led the appraiser to the conclusion that the market value, as of  06/21/10 is:

$        270,000

The opinion of value expressed in this report is contingent upon the limiting conditions attached to this report.

It has been a pleasure to assist you.  If I may be of further service to you in the future, please let me know.

Respectfully submitted,

Signature:_____

Douglas Sousa

File No.   1006223
Case No

# Appraisal Update and/or Completion Report

The purpose of this report form is to provide the lender/client with an accurate update of an appraisal and/or to report a certification of completion. The appraiser must identify the service(s) provided by selecting the appropriate report type.

| | | | | | |
|---|---|---|---|---|---|
| Property Address 4 Alberta Lane | | | | Unit # | |
| City Lakeville | | State | Ma | Zip Code 02347 | |
| Legal Description   Book 35373 Page 227 @ Plymouth County Registry of Deeds (12/06/07) | | | | County   Plymouth | |
| Borrower            N/A | Contract Price $   N/A | | Date of Contract   N/A | Effective Date of Original Appraisal | 06/21/10 |
| Property Rights Appraised   [X] Fee Simple   [ ] Leasehold   [ ] Other (describe) | | | | Original Appraised Value $  270,000 | |
| Original Appraiser  Douglas Sousa | | Company Name  Bankers Residential Appraisal Services | | | |
| Original Lender/Client Mr. Barry Reynolds | | Address  4 Alberta Lane, Lakeville, Ma 02347 | | | |

## [X] SUMMARY APPRAISAL UPDATE REPORT

**INTENDED USE:** The intended use of this appraisal update is for the lender/client to evaluate the property that is the subject of this report to determine if the property has declined in value since the date of the original appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal update is the lender/client.

**SCOPE OF WORK:** The appraiser must, at a minimum: (1) concur with the original appraisal, (2) perform an exterior inspection of the subject property from at least the street (3) research, verify and analyze current market data in order to determine if the property has declined in value since the effective date of the original appraisal.

**HAS THE MARKET VALUE OF THE SUBJECT PROPERTY DECLINED SINCE THE EFFECTIVE DATE OF THE ORIGINAL APPRAISAL?**   [X] Yes   [ ] No

After reviewing pertinent market data, it is the appraiser's opinion that the value of the subject property has declined since the effective date of the original appraisal. Please find attached comparable sales data to support the appraiser's conclusion.

**APPRAISER'S CERTIFICATION:** The appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal update in accordance with the scope of work requirements stated in this appraisal update report and concur with the analysis and conclusions in the original appraisal.
2. I performed this appraisal update in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal update was prepared.
3. I have updated the *appraisal by incorporating the original appraisal report.*
4. I have summarized my analysis and conclusions in this appraisal update and retained all supporting data in my work file.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal update assignment, have read the appraisal update report, and agree with the appraiser's analysis, opinions, statements, conclusions, and appraiser's certification.
2. I accept full responsibility for the contents of this appraisal update report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

## CERTIFICATION OF COMPLETION

**INTENDED USE:** The intended use of this certification of completion is for the lender/client to confirm that the requirements or conditions stated in the appraisal report referenced above have been met.

**INTENDED USER:** The intended user of this certification of completion is the lender/client.

**HAVE THE IMPROVEMENTS BEEN COMPLETED IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS STATED IN THE ORIGINAL APPRAISAL REPORT?**   [ ] Yes   [ ] No   If No, describe any impact on the opinion of market value.

**APPRAISER'S CERTIFICATION:** I certify that I have performed a visual inspection of the subject property to determine if the conditions or requirements stated in the original appraisal have been satisfied.

**SUPERVISORY APPRAISER'S CERTIFICATION:** I accept full responsibility for this certification of completion.

## SIGNATURES

**ADDITIONAL CERTIFICATION:** I/we certify that if this report was transmitted as an "electronic record" containing my "electronic signature", as those terms are defined in applicable federal and state laws (including audio and video recordings), or a facsimile tranmission of this report containing a copy or representation of my signature, the report shall be as effective, enforceable and valid as if a paper version of the appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature _____ |
| Name    Douglas Sousa | Name _____ |
| Company Name  Bankers Residential | Company Name _____ |
| Company Address 408 Wareham Street | Company Address _____ |
|    Middleboro, Ma 02346 | |
| Telephone Number  (508) 923-0205 | Telephone Number _____ |
| Date of Signature and Report  06/22/10 | Date of Signature _____ |
| Effective Date of Appraisal Update  06/21/10 | |

Bankers Residential
**EXTRA COMPARABLES 4-5-6**

File No.   1006223

Case No.

Borrower   N/A

Property Address   4 Alberta Lane

| City | Lakeville | County | Plymouth | State | Ma | Zip Code | 02347 |

Lender/Client   Mr. Barry Reynolds   Address   4 Alberta Lane, Lakeville, Ma 02347

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 4 Alberta Lane Lakeville, Ma 02347 | 11 Elders Pond Drive Lakeville, Ma 02347 | | 1 Furlong Circle Lakeville, Ma 02347 | | 2 Deerfield Lane Lakeville, Ma 02347 | |
| Proximity to Subject | | 1.78 miles NE | | 4.01 miles SE | | 4.41 miles NE | |
| Sale Price | $ N/A | $ 680,000 | | $ 480,000 | | $ 430,000 | |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 177.50 sq. ft. | | $ 155.74 sq. ft. | | $ 174.65 sq. ft. | |
| Data Source(s) | Inspection | B & T/Assessor/MLS | | B & T/Assessor/MLS | | B & T/Assessor/MLS | |
| Verification Source(s) | Assessor | Registry of Deeds | | Registry of Deeds | | Registry of Deeds | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | N/A | None | | None | | None | |
| Concessions | | Disclosed | | Disclosed | | Disclosed | |
| Date of Sale/Time | N/A | 04/01/10 | | 04/30/10 | | 05/18/10 | |
| Location | Average | Similar | | Similar | | Similar | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 3.57 Acres +/- | 2.29 Acres +/- | No adj. | 2.77 Acres +/- | No adj. | 1.6 Acres +/- | +10,000 |
| View | Nbhd/Woods | Pond Views | -100,000 | Nbhd/Woods | | Nbhd/Woods | |
| Design (Style) | Contemporary | Cape | | Colonial | | Colonial | |
| Quality of Construction | Good | Similar | | Similar | | Similar | |
| Actual Age | 6 +/- | 7 +/- | | 10 +/- | | 2 +/- | |
| Condition | Good | Similar | | Similar | | Similar | |
| Above Grade | Total 15 Bdrms. 5 Baths 5.50 | Total 11 Bdrms. 4 Baths 4.50 | +5,000 | Total 9 Bdrms. 4 Baths 2.50 | +15,000 | Total 8 Bdrms. 4 Baths 2.50 | +15,000 |
| Room Count | | | | | | | |
| Gross Living Area | 4,585 sq. ft. | 3,831 sq. ft. | +15,100 | 3,082 sq. ft. | +30,100 | 2,462 sq. ft. | +42,460 |
| Basement & Finished | Full | Full | | Full | | Full | |
| Rooms Below Grade | Unfinished | Finished | -10,000 | Unfinished | | Unfinished | |
| Functional Utility | Incomplete | Superior | -305,000 | Superior | -305,000 | Superior | -305,000 |
| Heating/Cooling | Radiant/CAC | FHW/CAC | | HyAir/CAC | | FWA/CAC | |
| Energy Efficient Items | None Noted | None Noted | | None Noted | | None Noted | |
| Garage/Carport | 3 Car Att. | 3 Car Att/3 Det | -15,000 | 3 Car Att. | | 2 Car Att. | +5,000 |
| Porch/Patio/Deck | Porches/Deck | Patio/Deck | No adj. | Porches/Deck | | Porches/Deck | |
| Fireplace | 1 Fireplace | 1 Fireplace | | 1 Fireplace | | 1 Fireplace | |
| Amenities | Amenities | Amenities | | Ingrd.Pool | -5,000 | Amenities | |
| Net Adjustment (Total) | | + X - | $ -409,900 | + X - | $ -264,900 | + X - | $ -232,540 |
| Adjusted Sale Price of Comparables | | Net Adj: -60% Gross Adj: 66% | $ 270,100 | Net Adj: -55% Gross Adj: 74% | $ 215,100 | Net Adj: -54% Gross Adj: 88% | $ 197,460 |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 12/06/07 | No other transfer noted over the past 12 months | No other transfer noted over the past 12 months | No other transfer noted over the past 12 months |
| Price of Prior Sale/Transfer | $1 Transfer of title | | | |
| Data Source(s) | (B & T/Assessor Records) | (B & T/Assessor Records) | (B & T/Assessor Records) | (B & T/Assessor Records) |
| Effective Date of Data Source(s) | Current | Current | Current | Current |

Analysis of prior sale or transfer history of the subject property and comparable sales   A transfer of title for nominal consideration is noted on 12/06/07. No other sale or transfer of the subject is noted over the past 3 yrs/36 mos.per B & T, MLS and assessor records. Sales 2 & 3 were acquired as part of a bulk land purchase as noted. No other sales or transfers of the comparable sales are noted over the past twelve months per B & T, MLS and assessor records.

Summary of Sales Comparison Approach   GLA was adj.@ $20 per sf., rounded, reflective of the subject's super-adequate size. The site adj.to sale 3

Bankers Residential
## COMMENT ADDENDUM

File No.    1006223
Case No.

Borrower   N/A

Property Address   4 Alberta Lane

| City   Lakeville | County | Plymouth | State | Ma | Zip Code | 02347 |

Lender/Client   Mr. Barry Reynolds          Address  4 Alberta Lane, Lakeville, Ma 02347

The subject is a partially completed contemporary style dwelling. The subject requires finished flooring, finished trim work, finished exterior siding, gutters, finished walls, landscaping, etc. Since the original appraisal, repair needs to the heating system and hot water heating system have arisen.  The estimated cost to complete is $305,000. Please note that the appraiser is not a contractor. Neither has a contractor been employed to provide an estimate to the appraiser. The estimate is based upon the appraiser's inspection of the subject property, information provided by the owner as well as conversations with local builders. The estimate is not offered as a guarantee of the actual cost to complete the subject property. Nonetheless, the appraiser feels confident that it reflects the market reaction to the unfinished nature of the subject property.

INTENDED USER: The Intended User of this appraisal report is Mr.Barry Reynolds. The Intended User is to evaluate the property value of the subject of this appraisal subject to the stated scope of work, purpose of the appraisal, reporting requirements of this appraisal report form, and definition of market value. THIS APPRAISAL IS NOT TO BE USED FOR MORTGAGE FINANCING PURPOSES. No additional Intended Users are identified by the appraiser. Please note that possession of this report does not create a client-appraiser relationship.

COMPARABLE SALES . The appraiser provided the most recent similar sales available. Additional sales were reviewed,but not selected as they were either less similar overall to the subject or they were dated sales which were considered less reliable. The lack of closer and/or more recent similar sales is not reflective of any adverse factors affecting the local real estate market. It is reflective of local development patterns and of the diverse local housing stock.

HAZARDOUS-TOXIC MATERIALS :    The appraiser does not have the expertise to conduct any tests for the presence of hazardous materials, nor have any such tests been performed for the appraiser. Should the client have any concerns regarding the presence of asbestos,radon,toxic mold and/or other hazardous materials on site or in the dwelling, the appraiser advises that the client retain an expert in the specific field to conduct the desired tests. It is an assumption of this appraisal that no hazardous conditions are present. EVIDENCE TO THE CONTRARY WOULD NULLIFY THE ESTIMATE OF MARKET VALUE AS DEFINED BY THIS APPRAISAL REPORT.

The use of well water is typical and not adverse in the subject town. Public water services are not available at the subject location. It is an express assumption of this appraisal that the well water used on site is of sufficient quality and quantity for domestic needs. EVIDENCE TO THE CONTRARY WOULD NULLIFY THE ESTIMATE OF MARKET VALUE AS DEFINED BY THIS APPRAISAL REPORT.

The subject is serviced by a private, on-site sewerage system. This is acceptable in the local market. Municipal sewer service is not available. While the appraiser saw  no evidence of a problem with, or seepage from the private sewer system, the appraiser is not an expert in the field. It is an express assumption of this appraisal that the subject's sewerage system conforms with state Title V regulations. EVIDENCE TO THE CONTRARY WOULD NULLIFY THE ESTIMATE OF MARKET VALUE AS DEFINED BY THIS APPRAISAL REPORT. A system which does not comply with these regulations may impact the market value and/or marketability of a property. The use of a qualified professional is required to render any determinations of compliance with Title V.  Such inspections are typically performed only at the time of the sale of a property.

The appraiser has conducted one other inspection of the subject property over the past 3 years.

## Appraiser License Certificate

File No.   1006223
Case No.

---

**OF REAL ESTATE APPRAISER**
**CERT RES. REAL ESTATE APPRAISER**

DOUGLAS SOUSA

48 GERTRUDE ST

SOMERSET        MA 02726-3529

70798        12/29/10        382337

Bankers Residential

# SUBJECT PHOTO ADDENDUM

File No.     1006223
Case No.

| Borrower | N/A | | | | | | |
|----------|-----|-----|-----|-----|-----|-----|-----|
| Property Address | 4 Alberta Lane | | | | | | |
| City  Lakeville | | County | Plymouth | State | Ma | Zip Code | 02347 |
| Lender/Client | Mr. Barry Reynolds | | | Address | 4 Alberta Lane, Lakeville, Ma 02347 | | |



**FRONT OF
SUBJECT PROPERTY**
4 Alberta Lane



**REAR OF
SUBJECT PROPERTY**



**STREET SCENE**

Bankers Residential
COMPARABLES 1-2-3

File No.    1006223
Case No.

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 4 Alberta Lane | | | | | | |
| City  Lakeville | | County | Plymouth | State | Ma | Zip Code | 02347 |
| Lender/Client | Mr. Barry Reynolds | | | Address | 4 Alberta Lane, Lakeville, Ma 02347 | | |



**COMPARABLE SALE #**    1
11 Elders Pond Drive
Lakeville, Ma 02347



**COMPARABLE SALE #**    2
1 Furlong Circle
Lakeville, Ma 02347



**COMPARABLE SALE #**    3
2 Deerfield Lane
Lakeville, Ma 02347

Bankers Residential
## SKETCH ADDENDUM

File No.    1006223
Case No.

| | |
|---|---|
| Borrower    N/A | |
| Property Address    4 Alberta Lane | |

| City   Lakeville | County | Plymouth | State | Ma | Zip Code | 02347 |
|---|---|---|---|---|---|---|

Lender/Client    Mr. Barry Reynolds        Address    4 Alberta Lane, Lakeville, Ma 02347



Bankers Residential
# SKETCH ADDENDUM

File No.    1006223
Case No.

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower    N/A | | | | | | |
| Property Address    4 Alberta Lane | | | | | | |
| City   Lakeville | County | | Plymouth | State | Ma | Zip Code    02347 |
| Lender/Client    Mr. Barry Reynolds | | | Address    4 Alberta Lane, Lakeville, Ma 02347 | | | |



| SKETCH CALCULATIONS | Perimeter | Area |
|---|---|---|
| A1 : 6.0 x 1.0 = | | 6.0 |
| A2 : 14.0 x 5.0 = | | 70.0 |
| A3 : 17.0 x 15.0 = | | 255.0 |
| A4 : 12.0 x 2.0 = | | 24.0 |
| A5 : 66.0 x 2.0 = | | 132.0 |
| A6 : 0.5(57.0 + 58.0)x1.0 = | | 57.5 |
| A7 : 0.5(74.0 + 75.0)x1.0 = | | 74.5 |
| A8 : 0.5(75.0 + 72.9)x3.0 = | | 221.8 |
| A9 : 0.5(69.9 + 68.4)x2.0 = | | 138.3 |
| A10 : 0.5(69.4 + 68.0)x2.0 = | | 137.4 |
| A11 : 37.0 x 3.0 = | | 111.0 |
| A12 : 24.0 x 16.0 = | | 384.0 |
| A13 : 12.0 x 1.0 = | | 12.0 |
| A14 : 68.0 x 1.0 = | | 68.0 |
| A15 : 23.0 x 2.0 = | | 46.0 |
| A16 : 22.0 x 4.0 = | | 88.0 |
| A17 : 12.0 x 8.0 = | | 96.0 |
| A18 : 0.5 x 5.0x5.0 = | | 12.5 |
| A19 : 13.0 x 5.0 = | | 65.0 |
| A20 : 0.5 x 3.0x3.0 = | | 4.5 |
| A21 : 0.5 x 2.4x3.0 = | | 3.6 |
| A22 : 21.0 x 3.0 = | | 63.0 |
| A23 : 0.5 x 1.6x2.0 = | | 1.6 |
| A24 : 26.4 x 2.0 = | | 52.8 |
| A25 : 0.5 x 9.0x4.0 = | | 18.0 |
| A26 : 57.0 x 4.0 = | | 228.0 |
| A27 : 0.5 x 4.0x4.0 = | | 8.0 |
| A28 : 61.0 x 4.0 = | | 244.0 |
| A29 : 0.5 x 9.0x9.0 = | | 40.5 |
| A30 : 64.0 x 9.0 = | | 576.0 |

Bankers Residential
**PLAT MAP**

File No.    1006223
Case No.

| Borrower | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 4 Alberta Lane | | | | | | |
| City Lakeville | | County | Plymouth | State | Ma | Zip Code | 02347 |
| Lender/Client Mr. Barry Reynolds | | | Address | 4 Alberta Lane, Lakeville, Ma 02347 | | | |



EXHIBIT "B"

Trustee David Madoff Chapter 7 Trustee role in Complainants case

Complainants realize that this complaint only pertains to the listed judges but the actions
of the Chapter 7 Trustee and the attorney involved in Complainants case are equally bias
and prejudicial to Complainants and we believe interferes with the administration of the
court's business and boarder on criminal.  Complainants believe based on the evidence
that the false and misleading statements made by the Trustee to the court have resulted in
prejudicial actions against Complainants and where it appears that the Chapter 7 trustee is
engaged in conspiracy and collusion with the Bank of Canton (BOC), Attorney
Braunstein to defraud Complainants out of their real property based on the evidence
before the court that shows the BOC has no beneficial interest in Complainants real
property and therefore lacked standing to invoke the jurisdiction of the court.

Complainants also wish to point out to this Honorable Council, and wherein all members
of the Council are attorneys, that you have a duty under your Judicial Canons to report
any attorney who has acted in violation of the Canons of Ethics and Disciplinary Rules
Regulating the Practice of Law, to wit:

Canon 3(B)(2)&(3) Administrative Responsibilities

(2)   A judge should require his staff and court officials subject to his direction and
control to observe the standards of fidelity and diligence that apply to him.

(3)   If a judge shall become aware of unprofessional conduct by a judge or lawyer

   (a) he shall, in the instance of a judge, report his knowledge to the Chief Justices of
       this court and of the court of which the judge in question is a member, and
   (b) in the instance of a lawyer, he **shall initiate appropriate investigative or
       disciplinary measures.**

Rule 8.3 – Reporting of Professional Misconduct

   (a) A lawyer having knowledge that another lawyer has committed a violation of the
       Rules of Professional Conduct that raises a <u>substantial</u> question as to that lawyer's
       honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the
       Bar Counsel's office of the Board of Bar Overseers.

   (b) A lawyer having knowledge that a judge has committed a violation of applicable
       rules of judicial conduct that raises a <u>substantial</u> question as to the judge's fitness
       for office shall inform the Commission on Judicial Conduct.

This would include the actions of:

Attorney Alan Braunstein, representing the Bank of Canton, fraud upon the court (possible felony charges: collusion and conspiracy to deprive Complainants of their property and rights)

Attorney David Baker, Complainants previous council for gross negligence in handling their bankruptcy case

Attorneys for the Department of Justice, Jamie Song, Andrea Haddad and Daniel Ryan, fraud upon the court, (also possible felony charges: concealment, filing false documents, conspiracy, collusion)

Attorney David Madoff, Chapter 7 Trustee, fraud upon the court, (possible felony charges: blackmail, coercion, conspiracy, collusion)

Attorney Christopher Fraga, Attorney who created Complainants trust, gross negligence by failing to inform Complainants that conveying the property with the pending legal issues could constitute fraud, failure to make appropriate disclosures of the transfer to the Bank.

1. Complainants filed revised schedules and a revised finance statement with the court as part of the conversion of their case listing several of the "creditors" as unsecured and disputed based on the evidence in Complainants Chapter 13 case, including the IRS and the BOC. Complainants reaffirmed the only "secured" creditor who provided proof of their claim.

2. On July 2, 2009 a meeting with the creditors was held by Trustee Attorney David Madoff. About five minutes into the meeting, this statement was made to Complainants by the trustee, "….so you don't like to pay taxes" (an audio transcript of this hearing is available upon request) to which Complainants take great exception, especially based on the overwhelming evidence before the court regarding the IRS claim. Complainants have ALL returns filed just the way the IRS likes them and have their returns prepared by a CPA. Complainants found this statement to be very prejudicial and the meeting had just barely started showing real bias towards Complainants. The meeting was also focused on Complainants trustee (Mr. DuBois), wherein it appeared to the Complainants that Attorney Madoff had an established agenda before the meeting was ever scheduled. At this meeting Complainants provide Attorney Madoff with a current appraisal of their property. The appraisal shows Complainants property to be seriously underwater thereby making Complainants case a **"no-asset"** case. Complainants wish to remind this court that theirs was a 100% distribution plan under Chapter 13. Complainants had legitimate disputes with several creditors and simply exercised their rights to have each and every creditor verify their claims. Complainants believe by the weight of the evidence before the court that they have carried the necessary burden to have the claims of the IRS and BOC dismissed. The **sole purpose "Cause in fact"** for Complainants bankruptcy petition was to seek the protection of the automatic stay to

prevent the IRS from levying their pay. By the overwhelming weight of evidence before this court, Complainants feel that the IRS claim should have been dismissed over a year ago, and that the IRS action to levy their pay was illegal wherein they have no judgments or properly recorded liens.

3. On or about July 16, 2009, Attorney Madoff filed a "verified" complaint against Complainants trust and individually against the trustee Mr. DuBois, for which there was no evidence to support his claims, document number 427, claiming that Complainants creditors had been defrauded. However, in Attorney Madoff's "verified" complaint, not one creditor is listed as being "defrauded" by Complainants, and to this date Complainants still do not know which creditor(s) have allegedly been defrauded or where any of Attorney Madoff's "verified" proof is. Complainants believe that the complaints filed by Attorney Madoff represent "strike" suits wherein Complainants lack the financial resources necessary to defend against such an action, and for what Complainants believe was to force them into a settlement with the Trustee in order to avoid prosecution that would him to collect his fee.

4. On or about August 6, 2009, Attorney Madoff filed a "verified" complaint against Complainants, document number 437, for which there was no evidence to support his claim that any creditor had been defrauded. Again, Complainants fully feel they had legitimate dispute regarding the claims of the IRS, the BOC and Resurgent Capitol, and by the weight of the evidence, before the court, believe those claims should have been dismissed.

5. On or about August 12, 2009, Attorney Madoff filed a Notice of Assets, document number 439, with the court, to spite the fact that Attorney Madoff was provided a copy of a recent appraisal, by a licensed appraiser, that showed the property to be underwater by over $90,000.

6. On July 20, 2009, at the hearing before Judge Bailey, Attorney Madoff blatantly lied to Judge Bailey by stating that Complainants informed him there was "equity" in their property. As noted in number 2 above, Complainants provided Attorney Madoff with an appraisal of the property and informed him it was seriously under water in value. The trustee, Mr. DuBois, asked in open court if there was anyone with a claim against him or the trust, no one came forward, including Attorney Madoff. Yet to spite this, Judge Bailey continued on with the hearing wherein no injured party or real party came forward. Judge Bailey then asked if there was anyone injuried for which Complainant Reynolds stepped forward and once again challenged the standing of Attorney Madoff (because of the issues surrounding the BOC standing) and repeatedly asked to have the so-called "creditors" identified that had suffered an injury by the Complainants. Judge Bailey did not order Attorney Madoff to identify anyone in complete denial of Complainants' due process rights because we cannot even examine the so-called creditors that have suffered some alleged injury. **Complainants have repeatedly challenged standing and jurisdiction and to date no evidence exists in the court records to demonstrate standing of any creditor**

**as required under Article III of the Constitution, Rule 17 of the FRCP, or the equivalent bankruptcy rule**, to spite the lack of standing and jurisdiction Judge Bailey issued orders granting Attorney Madoff Lis Pendes. **Complainants also believe where standing has never been established on the record that Judge Bailey's May 13, 2009 order converting Complainants case to one under Chapter 7, is void for lack of subject matter jurisdiction, rendering all orders based on it void as well**.

It is inconceivable to believe that Attorney Madoff, a seasoned and learned attorney and Chapter 7 Trustee, is not fully cognizant of the fraudulent claims of the IRS and the BOC based on the overwhelming mountain of evidence before the court that supports Complainants claims. **Complainants believe that Judges Feeney and Bailey, along with the Chapter 7 Trustee are actively engaged in fraud upon the court by covering up the clear fraud that the IRS's NFTL recorded on the private IRS computer that sits in the public access area of the court truly represents and have conspired to chill Complainants duty to bring forth this fraud to be fully investigated, 18 U.S.C. 4.**

7.  To spite the clear evidence that Complainants case is a **"no-asset"** case, Attorney Madoff is seeking to liquidate Complainants property for what Complainants believe is his own personal financial gain and the gain of Attorney Braunstein and the BOC. Attorney Madoff has made it perfectly clear that he intends to pay the IRS and the BOC to spite the overwhelming evidence before the court to show they have submitted false claims, or a the very least made several misrepresentations to the court.  Also, wherein this case has been very contentious in regards to the IRS and BOC, and wherein the Trustee's Office falls under the Department of Justice, if this would represent a conflict of interest in Complainants case, especially where Attorney Madoff has unequivocally stated that he intends to pay the IRS claim, to spite the overwhelming evidence before the court and believes this to be a serious conflict of interest that was not divulged to them in Attorney Madoff's statements of impartiality.  Attorney Madoff also seems to be engaged in directly preventing Complainants from being able to fully settle the matter regarding the BOC Proof of Claim, which Complainants believe should be fully investigated for its fraudulent practices regarding the recording of false documents (mortgages) in the public record (never transferred or conveyed) to skirt the filing requirements of those documents and subsequent assignments, **simply to collect his trustee's fee**.  Again Complainants want to remind you, theirs was a 100% distribution plan and all creditors had been paid up through July 2009, in good faith, by Complainants to spite the fact that evidence on the record shows several of them have no verified claim against Complainants.  The unreasonable delays caused by the judges and trustee in Complainants case is prejudicial to them and has caused them injury by being forced to remain in honor and pay claims that have not been properly verified wherein there has been dishonor by Attorney Madoff, blatant lying regarding the equity in the property to mislead the court for what appears to be his own personal gain and the detriment of Complainants valid creditors.  Again, Complainants property is

underwater by over $90,000, prior to conversion of their case to the Chapter 7 where in the previous Chapter 13 case, creditors were assured a 100% distribution. **Complainants believe the actions of the court to be prejudicial to Complainants legitimate creditors and to Complainants themselves where they will be rendered HOMELESS to pay claims that have no evidentiary support and where the court lacked jurisdiction to render them.**

8. Attorney Madoff with his "verified" claim, for which there is no supporting evidence, is seeking to have the trustee, Mr. DuBois, somehow be responsible for the alleged debt of Complainants where none of Complainants creditors have suffered an injury, nor is there any evidence on the record to show any injury. Complainants believe this to be an abuse of process and are now harassing and intimidating Complainants trustee for unverified debts and for which Attorney Madoff has refused to identify or state what injury any of Complainants "creditors" have suffered. Complainants believe Attorney Madoff's complaint has been brought forth in bad faith and with unclean hands in collusion with the BOC to defraud Complainants and their legitimate creditors. It is causing an unnecessary and unreasonable delay in dispensing with Complainants case which is prejudicial to them and has cause unnecessary expenses to be incurred by Complainants and Complainants trust and trustee, wherein the trustee must now retain the services of an attorney to defend against this abuse of process.

9. Due to the cost of defending themselves (estimates were over $50,000 each for Complainants and Mr. DuBois) Complainants have no choice but to enter into a settlement agreement, which Complainants believe to be a "strike suit' initiated on behalf of the BOC and the IRS and for Attorney Madoff to collect his "fee", wherein such settlement with the Trustee forces them to give up their rights to fully adjudicate their claims and to essentially commit perjury by being forced into stating that the BOC has a "secured" interest in Complainants property wherein it is absolutely clear based on Complainants position and evidence that they do not believe the Bank of Canton has a secured interest or beneficial interest in Complainants' property, see attached proposed settlement, Exhibit L. Also Complainants are being put into a position to have to make legal determination regarding the validity of the BOC status as well as the status of their homestead that was filed prior to the creation of Complainants trust. **Complainants do not believe they can make legal determinations, or to be forced to bear witness against themselves, or knowingly perjure themselves without serious legal repercussions.**

10. Also evidence, in the form of emails that were exchanged with our Attorney and the trustee in regards to this settlement indicate that Attorney Madoff is actively engaged in discussions with the BOC's attorney to have Complainants property liquidated. Attorney Braunstein (BOC's attorney) has stated that the BOC will accept far less (because Complainants believe the Bank of Canton was paid by conveying the mortgage to MERS, at the inception) than reasonable value for their "alleged" interest so they do not have to go through the process of lift stay and foreclosure. Again,

based on newly discovered evidence, the BOC never conveyed/transferred this mortgage to MERS or had it entered on the MERS system (no MIN number). **Complainants again wonder HOW MERS will be able to convey something back that was never transferred to them or had any knowledge of?** Complainants are completely being denied the ability to adjudicate what they believe to be a false claim that is fully supported by the evidence they entered, yet to spite this, the Court and the Trustee have turned a completely blind eye to all of it. Complainants believe Attorney Madoff's only interest is to sell Complainants property to obtain his commission, pay Attorney Braustein's legal fees (estimated to be $50,000), and for the BOC to gain access to Complainants property with unclean hands.

Respectfully submitted,

_____

Barry Reynolds

_____

Diane Reynolds